UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:07CR 98 HEA |
| | ) | |
| HORACIO CRUZ-ZUNIGA, | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

Defendant filed three pretrial motions: Motion for Severance (Document #147), Motion to Suppress the Contents of Electronic Surveillance (Document #148) and Motion to Suppress Suggestive Pretrial Identifications (Document #149). Before testimony was adduced at the evidentiary hearing, the parties discussed the status of the pretrial motions, and the defendant acknowledged that the Motion for Severance is moot (Tr. 4) and the Motion to Suppress Suggestive Pretrial Identifications is moot (Tr. 14). The motion that remained for determination is defendant's Motion to Suppress the Contents of Electronic Surveillance.

In his Motion to Suppress the Contents of Electronic Surveillance, the defendant argued two grounds:

1) **Minimization**. The defendant urged that the government in carrying out its electronic surveillance by means of wiretaps violated the requirement that it take steps to not overhear conversations that are not related to the case or to criminal activity. (Tr. 4).

2) **Necessity.** In the defendant's words, the government violated the requirement

that before engaging in electronic surveillance, the government must show other investigative techniques besides wiretaps could not reasonably be expected to succeed. (Tr. 5).

## The Testimony

The only witness called by the government was Special Agent Bernie Gard of the Drug Enforcement Administration (DEA). He had been with the DEA for three years and had worked approximately ten years prior to his employment in the DEA with various police departments, most recently, prior to joining the DEA, as a narcotics task force officer for three years. Gard testified that he was involved in a methamphetamine trafficking investigation in Southeastern Missouri/Northeastern Arkansas in the Winter of 2006 and Spring of 2007. He testified that he had been involved in over one hundred multi-jurisdictional investigations.

Gard testified that the trafficking group he was investigating was such a wide organization that he did not feel that the DEA and other agencies involved in the investigation had identified all of the participants in the trafficking organization or their roles in the organization by April of 2007. He stated that on April 3, 2007, he applied for a Title III interception of a wire/electronic communications for a telephone number, 870-824-9033, the primary user of which was Ruben Rocha. The first application was submitted to District Judge Catherine D. Perry, who approved the issuance of the wiretap.

Although a number of targets of the investigation were listed by name in the application and affidavit, Gard said that Cruz-Zuniga was not listed because he had not been identified at that point. In the affidavit, Gard stated that some of the conspirators

were not yet known to law enforcement and, in fact, the reason for the Title III wiretap was to learn the identities of other people involved.  Gard stated that he was responsible for making sure the requirements for minimizing telephone conversations which were intercepted through the wiretap were followed by those working on the case.

A second application was made to Judge Perry after the first 30-day period.  This application sought electronic surveillance of two telephone lines, the same telephone number as in the first application used by Ruben Rocha and the second number which was used by alleged co-conspirator Enrique Talavera-Garcia.  Agent Gard again executed the application and affidavit before Judge Perry, and Judge Perry issued the wiretap order.  In the second affidavit, for the first time, the defendant, Cruz-Zuniga, was identified as Juan Nino because Gard knew him only by the pseudonym of Juan Nino.  In the second affidavit, Gard testified that there were still participants in the trafficking organization whose identities the agents were unsure of.

## **Minimization**

Gard explained that the requirements of minimization are that you cannot listen to communications not pertinent to the case and you may not listen to privileged conversations. He has the responsibility of making sure those conversations or communications are not altered in any way.  Gard further explained that the monitor is only allowed to listen to pertinent conversations for up to two minutes or until they become non-pertinent.  He then stops.  After one minute of "not listening" then the monitor can begin listening again to determine whether the conversation is pertinent.  Gard stated that all communications are recorded on a magneto disk that cannot be altered

in any way.

Agent Gard elaborated on the procedure to be followed by the monitors. He testified extensively about the precautions taken to assure that there was minimization of the calls intercepted.

Gard stated that the first two minutes of any conversation are "free" in order for the monitor to determine if the call is relevant. Therefore, any call under two minutes would not be minimized. Gard testified that the monitor can listen to conversations over two minutes if they are incriminating or if the conversations are somehow related to the case unless they become non-criminal. Gard stated that the monitor is allowed to spot check (listen for a few seconds) approximately every minute to see if the conversation has turned to criminal matters.

Gard testified that there are widely accepted instructions used by the DEA for monitoring court-authorized wiretaps. Gard identified Document #4 of Group Exhibit (Ex.) #1 as containing the guidelines for the conduct of electronic surveillance of cell phones. Gard stated that a briefing was held with one or more U. S. Attorneys and any persons that were going to be privy to the conversations in the wire room. Gard stated the briefing was a meeting to go over the rules. He testified that prior to each person working on the wiretap, the monitor was instructed on the nature of the case and the facts known at the time. He was required to read the application, affidavit and Judge Perry's order authorizing the wiretap so that he knew the scope and nature of the investigation and what guidelines Judge

Perry has set forth.

Gard stated that each person at these meetings was required to read the written instructions for minimization and sign a sheet indicating that he had read and understood all the rules. Everyone who worked on the first intercept did so and those two sheets are attached to the back of Document #4. Gard stated that those instructions were gone over verbally by a lawyer for the government and everyone had the opportunity to ask questions about the instructions. Gard testified that in case any issues with the minimization arose, phone numbers were provided for himself, the case agent, the co-case agent and multiple Assistant U. S. Attorneys.

Gard continued that his supervisor and the supervisor of the monitors, the Spanish speaking monitors in the wire room, and any of the DEA agents in the wire room could answer questions regarding minimization. Gard stated that as the case agent he would be notified of any issues or problems arising. Gard stated Judge Perry issued the order, which is included in the wire book, and the wire was put in place. Gard stated he reviewed the daily line sheets summarizing the calls that were intercepted.

Gard stated that a line sheet is a summation of a call, a preliminary transcript. Gard stated he was not aware of any problems occurring during the first wiretap order and there were no privileged calls intercepted during that period. Gard explained that the reasoning for the two-minute listening period is that code words

may be used and the monitors need a little time to write down the code words.

Gard stated that it is typical for people in drug trafficking to use coded language or refer to drugs as other items and that was the case here. There were references to pictures, tools, food items, fertilizer and a reference to marijuana as "green fields." Gard stated there had also been coded references to drug proceeds in this case, which also typical of this kind of investigation.

Gard stated he expected conversations in Spanish and had requested permission from the court to delay minimization if a Spanish language was used without an interpreter present. Gard explained that if a call came in without a Spanish speaking monitor present, the call was recorded and as soon as the Spanish speaking monitor came into the room the monitor would see there was a call on their screen right away and they would listen to it utilizing the same rules as if it was coming in live.

Gard testified that the end result would be identical whether the monitor heard it live or two minutes later. Gard stated that there were Spanish speakers available as monitors throughout the pendency of the wires. Gard stated that the Spanish monitors are contract employees that pass background checks through the DEA and all but one had experience in listening to wiretaps and were familiar with the minimization rules. Gard stated the monitors are trained by the contract agency and take tests on their Spanish speaking skills as well as their interpretation skills.

Gard stated all the monitors went through a minimization briefing and were always supervised by an experienced person who was a monitor and interpreter himself. Gard stated there was a mechanism in place for double checking everybody's work on minimization and explained that "the plant" was open from 7:00 in the morning until 11:00 at night and the person working the night shift would come in a little early and read through everything that had occurred throughout the day. The night person would listen to all calls, look at the synopsis and make sure it was accurate and make changes if necessary. Gard said the day shift person would come in and listen to the calls that came in the night before so he would be up to speed on the case. There were always people checking and rechecking.

Gard stated that if somebody saw an error he/she would fix that error. Gard stated that if a call was minimized, it was gone, and nobody else could hear it. Gard stated that the only possibility of mistake would be finding that maybe the conversation should have been minimized and then deleting it. Gard stated that the "end result has been not only minimized but double checked for accuracy." Gard explained that there were some times when a Spanish expert was not available to listen as a monitor.

Gard stated that if a call came in Spanish, it would be recorded and as soon as a linguist came in, they would listen to it. Gard stated that that happened maybe once, twice at the most, out of approximately 60 days of monitoring. Gard stated

that 10-day reports were filed with the court throughout the course of the wire which detail the total number of calls and various statistics. Gard indicated the report listed the number of calls under two minutes which did not require minimization and calls over two minutes that were minimized during the period.[1]

Gard stated that everyone working on the wiretap signed off on these instructions prior to any interceptions. Gard stated that once the order was signed, he "threw the switch" and followed the procedures described previously.

**The Law**

Title 18 U.S.C. § 2518(5) provides that no order entered under that section may authorize or approve the interception of any wire communications "for any period longer than is necessary to achieve the object of the authorization...."

The court has set out extensively in the foregoing paragraphs summarizing the testimony of Agent Bernie Gard, the procedures taken by the monitors to be sure that the requirements for minimization were observed.

The court finds that the law enforcement officers and other personnel (e.g. interpreters) involved in carrying out the electronic surveillance authorized by Judge Perry complied with the requirements of law. The defendant's claim in his suppression motion, that the requirement of minimization mandated by Title 18 U.S.C. § 2518(5) were violated, should be denied.

---

[1] Government's Exhibits 2, 3 and 4 contain color graphs showing the percentage of calls minimized, calls under two minutes and calls over two minutes not minimized for Target Telephone #1 (Ex. 2), Target Telephone #2 (Ex. 3) and calls involving Cruz-Zuniga (Ex. 4).

## Necessity

Title 18 § 2518(3) provides that a judge may issue an ex parte order authorizing interception of electronic communications if the judge determines on the basis of facts submitted by the applicant that, among other findings: "(c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." This statutory requirement is close to the definition of necessity provided by the defendant in his motion quoted earlier.

Agent Gard alleged in his affidavit for the first 30-day period of electronic surveillance that the interception of communications would be necessary in order to identify all of the participants, the sources of supply and the financial resources of the organization. Using traditional methods of investigation, eight members of the drug trafficking organization had already been indicted and convicted at the time of the first application. However, each time a participant in the investigation was convicted, another member simply took the place of the person previously arrested.

Gard related that physical surveillance had been used, but its success was limited. The affidavit describes an incident where agents attempted to follow Ruben Rocha, a target of the electronic surveillance, away from a drug deal. As described in the affidavit, Rocha and his wife took a highway toward Blytheville, Arkansas, and approximately one mile after turning off of one state highway and onto another, Rocha suddenly parked the vehicle he was operating on the side of the highway and stayed there for approximately fifteen minutes before he continued to his home. The affidavit concluded, "Ruben Rocha's driving actions are suggestive that he was conscious of surveillance. At times during the investigation, Target Interceptees had changed the location or time of prearranged meetings with informants at the last minute. This appears to have

been done in part to avoid possible surveillance by law enforcement officers." (Government's Group Exhibit One, Document 2, pp. 29-30).

Rocha's wife, Wendy, whose telephone Ruben Rocha used for conducting his drug deals, subscribed to three cellular telephones. Two of the telephones were listed to Wendy Rocha at 1121 Knowles Street in Blytheville, Arkansas. When, in fact, Wendy Rocha and Ruben Rocha lived at 1120 Willow Street in Blytheville, Arkansas. As the affidavit points out, "drug distributors will often place deceiving or erroneous information on public records to mislead authorities, such as physical addresses, dates of birth, etc."

These are examples of actions taken by the drug dealers which led to Agent Gard's statement in the affidavit that based on his training and experience that "any attempts to conduct regular physical surveillance on the high-level members of this organization would prove fruitless. Either the organization members would detect the surveillance through their own counter-surveillance efforts, or agents would not be able to successfully follow them. Id.

The affidavit refers to consideration by the government of the use of electronic tracking devices such as "bumper beepers." This idea was rejected because "Lack of information as to which specific vehicles might be used to transport drugs and/or proceeds to and from the source, combined with fear of compromising the investigation should the device be located at the body shop during loading or unloading, has largely ruled out such use." Id. at p. 31.

The affidavit continues that physical surveillance, if not used in conjunction with other techniques including electronic surveillance, GPS tracking and the interception of wire or electronic communications conducted over the target telephone, is of limited value. The affidavit explains that physical surveillance is an investigative technique used to confirm meetings between alleged co-conspirators and often only leads investigators to speculate as to the purpose of the

meetings. It will not establish conclusively the elements of the subjects' violations and has not, nor will likely, establish conclusively the identities of various co-conspirators. The affidavit points out further that especially when it comes to the question of the identity and source of the supply of methamphetamine, prolonged or regular physical surveillance of the targets would most likely be noticed, causing them to become more cautious in their illegal activities, to flee to avoid further investigation and prosecution, to cause a threat to the safety of any potential cooperating individuals (CI's) and undercover agents and/or otherwise compromise the investigation. Id. at 31.

The affidavit described the use of undercover police officers and agents and gave reasons why that was not successful. Id. at 32.

The affidavit reviewed the use of CI's (cooperating individuals) and points out that cooperating individuals were either unaware of or unwilling to disclose the identity and location of the source of methamphetamine. The affidavit concluded that "There is presently no possibility of obtaining significant intelligence information from those defendants such as would further the goals of the investigation. The affidavit set out the officers' experience with CS #1, CS #2, CS #3 and CS #5, pointing out the shortcomings of the use of the CI's in gathering intelligence. Id. at 33. The affidavit reaches a conclusion that:

> The fact that the chances are so remote of introducing an additional confidential informant to members of this narcotic trafficking organization, makes it all the more imperative to employ alternative investigative techniques, such as the interception of wire and electronic communications. Without the requested interception, it is highly unlikely that Special Agents will be able to identify additional co-conspirators or locations of stash houses. Your Affiant believes that the investigation presently being conducted would not, without the evidence available through the requested electronic surveillance, result in a successful prosecution of all the participants involved in the organization. Based on the historical development of this investigation, this is especially true concerning the goal of identifying, locating and prosecuting the source of the supply of

methamphetamine.

Id. at 34.

Additionally, the use of grand jury subpoenas was considered and rejected for reasons set out in the affidavit. The affidavit also reviewed the possibility of interviews of subjects or associates, pen registers/toll analysis, search warrants, garbage extraction and financial investigation, all of which contained deficiencies for obtaining information necessary for the completion of the investigation and prosecution of the participants in the drug trafficking organization. Id. at pp. 34-40.

Further alleging the necessity of wire intercepts, Gard stated in the affidavit that neither all of the members of the narcotic trafficking/money laundering organization in Southeastern Missouri, nor all of the organization's sources of supply have been fully identified. Gard stated that it was his belief that the interception of wire communications is the best technique with the reasonable likelihood of securing evidence necessary to prove beyond a reasonable doubt that the Target Interceptees, and others unknown, are engaged in the above-described offenses. Id. at pp. 38-39.

The government points out in its memorandum that the purpose of the necessity section (18 U.S.C. § 2518(1)(c)) is not to foreclose wiretapping until every other possible method of investigation has failed, but to ensure that it is not routinely employed as the initial step of an investigation, or where traditional investigative techniques would suffice to expose the crime. United States v. Daly, 535 F.2d 434, 438 (8th Cir. 1976). The government urges further that it is not required to exhaust every available investigative technique before applying for an interception, citing United States v. O'Connell, 841 F.2d

1408, 1415 (8th Cir. 1988), and United States v. Macklin, 902 F.2d 1320, 1326 (8th Cir. 1990).

As related at length above, all of the investigation techniques used previously and described in the affidavit failed to expose the complete scope of the enterprise and to determine the extent of present operations. In United States v. Maxwell, 25 F.3d 1389, 1394 (8th Cir. 1994), the Eighth Circuit found that, "Even if conventional techniques have been somewhat successful, however, a wiretap may still be authorized." The Court also found that, "Officers had not been able to determine from other investigative methods the scope of the suspected conspiracy or to develop enough evidence to successfully prosecute the subjects whom they had identified." Id. Both United States v. Macklin, 902 F.2d 1320, 1327 (8th Cir. 1990), cert. denied, and Maxwell found that § 2518(1)(c)'s necessity requirement is satisfied when normal investigative procedures failed to reveal the scope of the conspiracy and all persons involved.

This court finds that the applications and affidavits presented to Judge Perry established the necessity required by Title 18 § 2518(3) and that the wiretaps were properly ordered by Judge Perry.

**IT IS, THEREFORE, RECOMMENDED** that defendant's Motion to Suppress the Contents of Electronic Surveillance (Document #148) be denied.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(l), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of

the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

_Lewis M. Blanton_
LEWIS M. BLANTON
United States Magistrate Judge

Dated this 8th day of February, 2008.